UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RWJ COMPANIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-cv-1394-DFH-TAB |
| | ) | |
| EQUILON ENTERPRISES, LLC d/b/a | ) | |
| SHELL OIL PRODUCTS US, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiff RWJ Companies, Inc. ("RWJ") operates a "cluster" of 36 Shell-branded filling stations in the Indianapolis area.  RWJ operates these stations pursuant to a set of contracts with defendant Equilon Enterprises, LLC ("Shell"), which is a Shell Oil subsidiary that actually owns the Shell stations that RWJ operates.  In March 2005, Shell notified RWJ that it planned to terminate the contracts between the parties and to offer the Shell stations for sale to interested buyers.  RWJ bid to purchase the stations it had been operating.  Shell chose to accept a higher bid from another company.  RWJ now faces imminent termination.

RWJ has sued Shell on a number of different claims.  RWJ has moved for a preliminary injunction against Shell to prevent termination of its contracts, relying on the Indiana Deceptive Franchise Practices Act, Indiana Code § 23-2-2.7-1. RWJ argues that its agreements with Shell are subject to the statute and that

the statute requires Shell to renew the contracts indefinitely, so long as Shell lacks good cause to fail to renew.  Shell argues that the parties' contracts do not amount to a franchise agreement subject to the statute and that in any event it is not required to renew the contracts indefinitely.

The court held a hearing on December 1, 2005 with stipulated evidence. After that hearing, Shell notified RWJ and the court that it intends to close the sale to the higher bidder in the near future, so that there is a need for the court to address the motion at this time.

I.      *Standard for Preliminary Injunction*

To obtain preliminary injunctive relief, RWJ must show first that it has some likelihood of success on the merits of its claims seeking to block termination of the contracts, and second that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied.  *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992).  If RWJ can meet these requirements, the court must then balance the irreparable harm that would result to the opposing party if preliminary relief is erroneously granted against the irreparable harm to the moving party if the relief is erroneously denied.  Finally, the court must consider the public interest, which includes the interests of any persons who are not parties to the case.  *Id.* at 11-12.  The court must then weigh all of those factors in exercising its equitable discretion, "seeking at all times to 'minimize the costs of being mistaken."  *Id.* at 12, quoting *American Hospital*

*Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986). The approach has been described as a sliding scale approach in which the relative strengths of the parties' positions and the degree of threatened harms are balanced against each other. *Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002); *Abbott Laboratories*, 971 F.2d at 12 & n.2; *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir. 1984).

Under the sliding scale approach, it is at least theoretically possible for a party to win a preliminary injunction where it has only a "better than negligible" chance of success on the merits. That phrase stems originally from Judge Posner's opinions in *Roland Machinery Co.*, 749 F.2d at 387, and *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir.1982). Although the "better than negligible" phrase appears often in Seventh Circuit opinions, few if any decisions have actually granted or affirmed preliminary injunctions based on a chance of success on the merits that a court found to be only "better than negligible." Where the balance of harms does not heavily favor the moving party, the moving party must show at least a "reasonable likelihood" of success on the merits. *E.g.*, *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988); accord, *Eco Mfg. LLC v. Honeywell Int'l, Inc.*, 295 F. Supp. 2d 854, 865 n.4 (S.D. Ind. 2003), *aff'd*, 357 F.3d 649 (7th Cir. 2003).

II.  *Likelihood of Success on the Merits*

Shell has provided RWJ with notice of its intent to terminate the parties'
contracts in accordance with the notice requirements set forth in the contracts.
To obtain preliminary injunctive relief, RWJ contends that the terms of the
contracts allowing the termination violate the Indiana Deceptive Franchise
Practices Act .

A.  *Application of Deceptive Franchise Practices Act*

The first issue is whether RWJ's contract with Shell is a franchise
agreement under Indiana law.  The Deceptive Franchise Practices Act incorporates
the definition of a franchise from the Franchise Act, codified in Indiana Code § 23-
2-2.5-1.  The Deceptive Franchise Practices Act definition provides:

> For the purposes of this chapter, franchise means any franchise as defined
> in IC 23-2-2.5-1, clauses (a)(1) (2) and (3), and any agreement meeting the
> provisions of IC 23-2-2.5-1, clauses (a)(1) and (2) which relates to the
> business of selling automobiles and/or trucks and the business of selling
> gasoline and/or oil primarily for use in vehicles with or without the sale of
> accessory items.

Ind. Code § 23-2-2.7-5.  The referenced Franchise Act definition is as follows:

> (a)   "Franchise" means a contract by which:
>
> (1)   a franchisee is granted the right to engage in the business of
>       dispensing goods or services, under a marketing plan or system
>       prescribed in substantial part by a franchisor;
>
> (2)   the operation of the franchisee's business pursuant to such a plan is
>       substantially associated with the franchisor's trademark, service

mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and

(3)    the person granted the right to engage in this business is required to pay a franchise fee.

Ind. Code § 23-2-2.5-1(a).

The contracts between Shell and RWJ are a "Multi-Site Contractor Operated Retail Outlet Agreement (called the "2003 MSO Agreement") and a "Multi-Site Non-Petroleum Facility Lease" (called the "2003 MSO Lease"). Both agreements are dated June 9, 2003, and were amended by an "Amendment Agreement" dated March 7, 2005, which gave Shell the right to terminate the agreements on six months notice.

Shell is the owner or the principal tenant for all of the filling stations at issue here. Under the MSO Agreement and MSO Lease, RWJ leases convenience store facilities and car-washes that are part of the properties. RWJ also agrees to operate and manage the fuel pumps and associated equipment for fueling and servicing vehicles. RWJ does not buy and sell the fuel itself; Shell retains ownership of the fuel. Also, Shell retains control over the retail pricing of the fuel. Shell pays RWJ a fee for operating the fuel pumps and related services. RWJ operates the convenience store for its own benefit, owning the inventory and selling it for its own profit. RWJ also operates the car-washes for its own benefit.

The parties agree that RWJ did not pay a franchise fee for the right to engage in business under the MSO Agreement and MSO Lease.  Under the Indiana definition in the Deceptive Franchise Practices Act, the absence of a franchise fee does not prevent application of that statute.  RWJ's agreement "relates to the business . . . of selling gasoline and/or oil primarily for use in vehicles with or without the sale of accessory items."  Ind. Code § 23-2-2.7-5.  Accordingly, RWJ is not required to show it paid a franchise fee to take advantage of the terms of the Deceptive Franchise Practices Act.[1]

Shell has designed its MSO Agreements so as to avoid application of the federal Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.*, and perhaps many state franchise statutes, as well.  Most important, under the MSO Agreement, the local operator does not buy motor fuel from Shell and then sell it

---

[1]The Tenth Circuit has interpreted this provision of the Indiana statute to require a franchisee to show that its agreement relates to *both* the business of selling automobiles and/or trucks *and* the business of selling gasoline and/or oil primarily for use in vehicles.  *Sports Racing Services, Inc. v. Sports Car Club of America, Inc.*, 131 F.3d 874, 892 (10th Cir. 1997) (applying Indiana law).  Although this interpretation has some support in the phrasing of the statute, it is clear that the Indiana law is intended to apply to an agreement that relates *either* to the business of selling automobiles and/or trucks *or* to the business of selling gasoline and/or oil primarily for use in vehicles.  Under the Tenth Circuit's narrower interpretation, the special provision for auto dealers and motor fuel dealers would apply to few if any businesses.  This court agrees with Judge Young that the narrower interpretation of the statute is not one the Indiana courts are likely to adopt.  See *Ayers v. Marathon Ashland Petroleum, LLC*, 2005 WL 2428205, *4 (S.D. Ind. Sept. 30, 2005) ("The exception would be carved so narrowly as to apply to no one.  [Defendant] has provided no evidence of, and the court is unaware of, any substantial number of companies that engage in the business of selling both automobiles and gasoline.  The legislature must, therefore, have meant for the exception to apply to both automobile dealers and sellers of gasoline and/or oil.") (citation omitted).

to the retail public.  Instead, Shell retains ownership of the fuel, sets the prices, and pays a fee to the operator for actually operating the filling station.  Under this arrangement, Shell retains essentially all substantial market and other risks associated with ownership and sale of the fuel.  A number of courts have therefore held that these agreements are not subject to the federal PMPA and some other state franchise statutes because the station operator is not in the business of selling the fuel.  *E.g.*, *Farm Stores, Inc. v. Texaco, Inc.*, 763 F.2d 1335, 1343 (11th Cir. 1985) (PMPA did not apply where operator never took title to fuel and bore no substantial risks connected with its sale); *Karak v. Bursaw Oil Corp.*, 147 F. Supp. 2d 9, 13-15 (D. Mass. 2001) (PMPA did not apply where contract provided that operator had title to fuel only during few seconds it took to pass from underground storage tanks through pumps and into customer's vehicle; state law claims left to state courts);  *Dunlap v. Schrader Oil Co.*, 758 F. Supp. 633, 634 (D. Colo. 1991) (PMPA did not apply to operator who never took title to fuel and bore no significant market risks; state law claims left to state courts); *Automatic Comfort Corp. v. D & R Service, Inc.*, 627 F. Supp. 783, 786-87 (D. Conn. 1986) (state franchise law did not apply where operator did not take title to fuel and bore no substantial risks connected with sale); *Automatic Comfort v. D & R Service, Inc.*, 620 F. Supp. 1349, 1357-58 (D. Conn. 1985) (PMPA did not apply in same case); see also *Getty Petroleum Marketing, Inc. v. Ahmad,* 757 A.2d 494, 501 (Conn. 2000) (Connecticut franchise law did not apply where station operator did not take title to fuel or face market risks).

The PMPA defines a retailer as "any person who purchases motor fuel for sale to the general public for ultimate consumption."  15 U.S.C. § 2801(7).  RWJ does not fit that definition under federal law, but it relies only on Indiana law.  The Indiana statute uses a broader definition for a franchise that does not necessarily require the franchisee to hold title to the products being sold.  Clause (a)(1) of the definition requires a contract by which a franchisee is granted "the right to engage in the business of *dispensing* goods or services . . . ."  Ind. Code § 23-2-2.5-1(a)(1). The stipulated evidence demonstrates that the MSO Agreement grants RWJ the "right to engage in the business of dispensing" Shell-branded motor fuels.  The court finds that RWJ is reasonably likely to be able to satisfy this requirement of the Indiana definition of a franchise.

RWJ may also be able to show that it engages in this business of dispensing motor fuels "under a marketing plan or system prescribed in substantial part by a franchisor."  The evidence before the court at this point shows that Shell controls retail prices of the motor fuel.  MSO Agreement ¶ 5(b)(3).  "Price is perhaps the most fundamental aspect of a marketing plan."  *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1181 (2d Cir. 1995) (finding agreements for distribution of baked goods were subject to state franchise law).

Perhaps equally important, Shell prescribes elaborate standards for MSO operators like RWJ governing every aspect of the filling station operation, from the lettering of signs and employee uniforms to the trimming of grass and shrubbery

and the painting of the curbs, and whether customers must pre-pay and which credit cards they may use.  MSO Agreement ¶ 5(b) & (c)  (incorporating Shell "Brand Standards" and "Blue Book") and MSO Agreement Exs. B and E; see also Ex. G (reference guide for operations with photos showing "compliant" and "non-compliant" operations); Ex. H (Shell brand presentation specifying use of Shell signs, logos, and trademarks, including precise fonts and colors); Ex. I (retail design bulletin describing new interior graphics for Shell brand convenience stores); Ex. P (detailed instructions on when and how to use Pecten symbol); Exs. Q and R (photos showing use of Shell name, logos, and trademarks throughout filling stations facilities and convenience store).  RWJ has shown that it may well be able to satisfy the requirements of clause (a)(1) of the franchise definition.

Shell argues that the MSO Agreement does not provide any exclusive sales territory, that Shell does not establish sales quotas or control RWJ's decisions on hiring and firing employees, and that Shell does not require sales training for anyone other than one key employee.  Shell relies on these factors to distinguish the case from *Master Abrasives Corp. v. Williams*, 469 N.E.2d 1196 (Ind. App. 1984), a case affirming a finding that a franchise existed.[2]  It is clear, however, that the factors in *Master Abrasives* were not intended to be exhaustive.  See *Horner v. Tilton*, 650 N.E.2d 759, 762 (Ind. App. 1995).  Instead, what is required is a close look at "the nature of the obligations that the agreement imposes upon

---

[2]The Indiana Supreme Court later disagreed with *Master Abrasives* on an unrelated issue of securities law in *Enservco, Inc. v. Indiana Securities Division*, 623 N.E.2d 416, 421-25 (Ind. 1993).

the putative franchisee, particularly with respect to franchisor mandates regarding sales of goods or services." *Id.*

The evidence in this case shows that Shell retained extensive control over the marketing of fuel and every aspect of the filling station operation, as well as substantial control over the marketing of convenience store products and services. When reading cases addressing this issue, it is important to recognize that RWJ operates only Shell-branded filling stations and that RWJ's convenience stores are associated very closely with both the filling station operations and the Shell brand. This case therefore is not like *Hoosier Penn Oil Co. v. Ashland Oil Co.*, 934 F.2d 882, 885-86 (7th Cir. 1991), for example, where the plaintiff distributor carried many brands of petroleum products, did less than ten percent of its overall product sales in the manufacturer's brand, and was not subject to a sales quota imposed by the manufacturer [controlled its own retail prices]. Additionally, the distributor in *Hoosier Penn* did not always use the manufacturer's logo in its correspondence, used the logo on only one of its nine trucks, and did not require its truck drivers to wear uniforms bearing the manufacturer's logo. The *Hoosier Penn* court affirmed denial of a preliminary injunction under such circumstances, but the cases are not comparable.

On the issue of the marketing plan, this case is closer to *Continental Basketball Ass'n, Inc. v. Ellenstein Enterprises, Inc.*, 640 N.E.2d 705, 708 (Ind. App. 1994), *aff'd and adopted in relevant part*, 669 N.E.2d 134, 137 (Ind. 1996),

which affirmed summary judgment for the franchisee team against the league. Though sports leagues have their own special characteristics, the evidence showed a marketing plan prescribed in substantial part by the franchisor-league:

> Ellenstein agreed to comply with the CBA by-laws, a 100-150 page "Operations Manual" and the CBA's rules and regulations. These documents controlled the transfer of title to an interest in the league, and nearly every other aspect of the selling of CBA professional basketball entertainment, including the acquisition and signing of coaches and players; the responsibilities of owners, business managers, general managers, coaches and players; personnel rules and official rules for play; playoff procedures and awards; procedures for the provision of concessions and souvenir sales; procedures for trainers; public relations; equipment suppliers; ticket and box office procedures; score-keeping and timing; public address announcements; security; and mascots and cheerleaders.

640 N.E.2d at 708.  The evidence in this case shows comparable detail in Shell's prescription for marketing fuel as well as the associated convenience store operation.

Clause (a)(2) in the statutory franchise definition requires that the operation of the franchisee's business pursuant to such a marketing plan must be "substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate."  Ind. Code § 23-2-2.5-1(a)(2).  Regardless of whether the association must be proved based on only the convenience store operation or the combined filling station/convenience store operation, RWJ can satisfy this requirement of Indiana law.  The MSO Agreement requires RWJ to operate the filling stations as Shell-branded stations using one of the most famous

trademarks in the United States, the familiar yellow and red Shell sign using the shape of the "Pecten" or sea-shell.[3]

The MSO Agreement and the MSO Lease require extensive use of the Shell signs, name, marks and colors.  (They do not merely "allow" such use, as Shell contends in this lawsuit.)  The MSO Lease and MSO Agreement require use of those signs, marks, and colors not only in the exterior signage, on the pumps, *et cetera*, but also inside the RWJ convenience stores in which Shell has no direct financial interest.  The RWJ employees, for example, wear Shell-approved uniforms with Shell logos.  They do so whether they are providing services in the convenience stores, attending to the car-washes, assisting customers who are pumping fuel, or cleaning and maintaining the fuel pumps and associated equipment.  See  Ex. G (reference guide for operations with photos showing "compliant" and "non-compliant" operations, including uniforms with Shell logos for convenience store employees); Ex. H (Shell brand presentation specifying use of Shell signs, logos, and trademarks, including precise fonts and colors); Ex. I (retail design bulletin describing new interior graphics for Shell brand convenience stores); Ex. P (detailed instructions on when and how to use Pecten symbol); Exs. Q and R (photos showing use of Shell name, logos, and trademarks throughout filling stations facilities and convenience store).  The MSO Lease also prohibits

---

[3]Shell's instructions to RWJ even go so far as to specify that it is "Pecten" with a capital "P."  Ex. H at 00923.

RWJ from selling products in the convenience stores that compete with Shell-branded products.  MSO Lease ¶ 7(c).

This evidence of association of the business with Shell's trademarks, name, and logos goes far beyond what was shown in *Continental Basketball Association*. See 640 N.E.2d at 708-09 (affirming summary judgment finding that franchise existed).  Accordingly, the court finds that RWJ has shown a reasonable likelihood of proving that its MSO Agreement and MSO Lease are subject to the Deceptive Franchise Practices Act.  (They are not subject to the elaborate registration and substantive requirements of the Franchise Act, however, because RWJ did not pay a franchise fee required to trigger application of Ind. Code § 23-2-2.5-1 *et seq.*)

B.    *Statute of Limitations*

Establishing likely application of the Deceptive Franchise Practices Act is not enough for RWJ to show a reasonable likelihood of success on its challenge to the termination of the MSO Agreement and MSO Lease.  Shell contends that RWJ has waited too long to challenge the legality of the agreements.

The Deceptive Franchise Practices Act provides:  "No action may be brought for a violation of this chapter more than two (2) years after the violation."  Ind. Code § 23-2-2.7-7.  The Indiana Court of Appeals recently applied this statute of limitations in a way that effectively bars RWJ's statutory claims, in *Kahlo Jeep Chrysler Dodge of Knightstown, Inc. v. DaimlerChrysler Motors Co.*, 835 N.E.2d 526

(Ind. App. 2005).   In *Kahlo Jeep*, several automobile franchisees alleged that DaimlerChrysler had violated the Deceptive Franchise Practices Act by including in the terms of its franchise contracts a term that allowed the franchisor to modify the agreement substantially without the written consent of the franchisee.   See Ind. Code § 23-2-2.7-1(3).   The plaintiffs had signed their franchise agreements more than two years before DaimlerChrysler actually attempted to exercise its rights under the agreements to modify them substantially, and more than two years before the plaintiffs filed suit to block the modifications.

The Indiana Court of Appeals concluded that the alleged violations occurred at the time each agreement was signed, so that the two-year limitations period began running at that time, and not when DaimlerChrysler actually tried to exercise that power.   "The two-year statute of limitations in the Act appears to represent a clear policy choice by the legislature that . . . place[s] the burden on the franchisees to challenge any facially improper franchise contract provision within two years of the contract's formation."   *Kahlo Jeep*, 835 N.E.2d at 530. That decision is consistent with *Anderson v. Indianapolis Indiana AAMCO Dealers Advertising Pool*, 678 N.E.2d 832, 836 (Ind. App. 1997) (franchisee's claims for violations of Ind Code § 23-2-2.7-1 were barred where franchisee executed alleged franchise agreement in 1986 but did not assert claims until 1994), and with Judge Steckler's decision in *Monroe County Oil Co. v. Amoco Oil Co.*, 75 B.R. 158, 162 (S.D. Ind. 1987) (claim arose when contract was executed, not when alleged

-14-

franchisor sought to apply challenged contract provision), both cited in *Kahlo Jeep*.

Under the reasoning of *Kahlo Jeep*, RWJ's challenge to the terms of its 2003 contracts as facial violations of the Indiana Deceptive Franchise Practices Act are barred.  RWJ signed the operative agreements with Shell on June 9, 2003, and it did not file suit until September 16, 2005, more than three months after the two-year period expired.

RWJ offers several arguments in rebuttal.  First, it argues that *Kahlo Jeep* was poorly reasoned, is subject to a transfer petition before the Indiana Supreme Court, and will probably not be affirmed or followed.  A federal court exercising its diversity jurisdiction is obliged to decide questions of state law as it believes the state's highest court would.  *E.g.*, *U.S. Fire Ins. Co. v. Barker Car Rental*, 132 F.3d 1153, 1156 (7th Cir. 1997); *Ayers v. Marathon Ashland Petroleum LLC*, 2005 WL 2428205, *4 (S.D. Ind. Sept. 30, 2005).   Where the Indiana Supreme Court has not decided a particular issue, the Seventh Circuit reads Indiana Court of Appeals decisions as providing a strong indication of how it believes the Indiana Supreme Court would decide the issue, unless there is a persuasive reason to believe otherwise.  *Klunk v. County of St. Joseph*, 170 F.3d 772, 777-78 (7th Cir. 1999); *General Accident Ins. Co. of America v. Gonzales*, 86 F.3d 673, 675 (7th Cir. 1996). While there is certainly room to argue about the question, the court sees no persuasive reason to expect the Indiana Supreme Court to disagree with the Court of Appeals in the *Kahlo Jeep* case.  At this preliminary stage of the case, the court

finds that the better course is to follow *Kahlo Jeep* as an authoritative statement of Indiana law on applying the statute of limitations under the Deceptive Franchise Practices Act.

Second, RWJ argues that *Kahlo Jeep* should not apply here because the Shell contracts deceived RWJ into believing it had no rights under the Deceptive Franchise Practices Act. RWJ contends this amounts to a continuing wrong that could be challenged at any time. Judge Young rejected the continuing wrong theory as applied to the Deceptive Franchise Practices Act in *Ayers*, 2005 WL 2428205, at *3, where the plaintiffs had all the information they needed to bring their claims more than two years before the suit was filed. Similarly here, the 2003 documents stated that they were not subject to the statute, and included all the terms that RWJ now contends require application of the statute. RWJ had all the information it needed to seek reformation immediately after the contracts were signed, so that *Kahlo Jeep* applies here.

Third, RWJ argues that the March 7, 2005 Amendment Agreement started the two-year clock running anew because Shell violated the statute in obtaining RWJ's consent to the Amendment Agreement, and because the Amendment Agreement itself violated the Act. This argument is a variation on the continuing wrong theory, for under plaintiff's theory both the original agreements and the Amendment Agreement violated the statute. Even if plaintiff could succeed in

-16-

challenging the Amendment Agreement, the effect would be to restore the parties to the terms of the 2003 MSO Agreement and MSO Lease Agreement.

In sum, the court concludes that RWJ has shown a reasonable likelihood of prevailing on its contention that its MSO Agreement and MSO Lease with Shell are subject to the Indiana Deceptive Franchise Practices Act. However, apart from RWJ's claims regarding the Amendment Agreement executed in March 2005, RWJ's claims brought under the Act are not timely. To the extent the Amendment Agreement made the contracts more onerous regarding termination, the court assumes that RWJ has a claim that may at least be timely. Narrowing RWJ's statutory claims on the merits in this way, however, has decisive implications for whether injunctive relief should be granted in terms of whether RWJ faces a threat of genuinely irreparable harm.

III.   *Irreparable Harm*

The factor that weighs most heavily against injunctive relief is whether RWJ faces genuinely irreparable harm. The 2003 MSO Agreement is due to expire by its own terms in June 2006, less than six months from now. Even if RWJ could prevail on his claim that the Amendment Agreement should be deemed void or unenforceable, that conclusion would leave the parties' relationship to be governed by the 2003 MSO Agreement and MSO Lease. In the 2003 MSO Agreement, Shell and RWJ agreed that neither is required to renew the agreement upon its

expiration.  If that provision of the agreement is valid, then Shell is entitled to force RWJ out of the Shell service stations no later than June 2006.

Thus, in the absence of an injunction, RWJ would still lose its contract with Shell no later than next June.  If an injunction is denied erroneously, damages for such a brief period would still be subject to reasonable estimation.  That fact distinguishes this case from the situation described in *Roland Machinery*, where the court commented that termination of a business that could reasonably be expected to last indefinitely can amount to irreparable harm.  See 749 F.2d at 386, quoting *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970).  Cf. *Micro Data Base Systems, Inc. v. Nellcor Puritan Bennett, Inc.*, 165 F.3d 1154, 1157 (7th Cir. 1999) (affirming denial of injunction to prevent termination of distributorship; courts "routinely tote up and award as damages the loss inflicted by wrongful terminations of distributorships").

RWJ argues that the non-renewal provision is not enforceable because it violates the Indiana Deceptive Franchise Practices Act.  That statute provides that it is a violation of law for a franchise agreement subject to the statute to contain a provision that:

> Permit[s] the franchisor to fail to renew a franchise without good cause or in bad faith.  This chapter shall not prohibit a franchise agreement from providing that the agreement is not renewable on expiration or that the agreement is renewable if the franchisee meets certain conditions specified in the agreement.

-18-

Ind. Code § 23-2-2.7-1(8).

      The contractual provision in question here, Paragraph 24(c) of the 2003 MSO Agreement, provides:

> Renewal/Nonrenewal.  Upon expiration of the term, this Agreement may be renewed by the parties or either Company or Operator may refuse renewal for any reason or no reason.  If the parties agree to renew the relationship, they shall execute a new agreement in the form then regularly used by Company for multi-site contract operations.  The new agreement shall supersede this Agreement and may include significant changes from this Agreement.

Cplt. Ex. A.

      Under the Seventh Circuit's reasoning in *Wright-Moore Corp. v. Ricoh Corp.*, 980 F.2d 432, 437 (7th Cir. 1992), the 2003 MSO Agreement does not violate the statute.  In *Wright-Moore*, the parties had agreed to a contract with a one-year term.  The plaintiff claimed that it had a franchise under Indiana law and that the defendant's failure to renew the agreement violated Section 1(8) of the Deceptive Franchise Practices Act.  As the district court's opinion shows, the agreement allowed renewal but did not guarantee it.[4]  The district court granted summary

---

[4]The agreement in *Wright-Moore* provided:

This Agreement shall commence as of the date hereof and, unless earlier terminated as provided herein, shall continue in effect for an initial period of one (1) year.  Thereafter, this Agreement may be renewed for additional one (1) year periods by written agreement of both parties at least sixty (60) days prior to the expiration of the initial term or any annual renewal term.

(continued...)

-19-

judgment for the alleged franchisor on this claim.  The court rejected the plaintiff's argument that the statute's safe harbor would require the contract to state either that it is not renewable at all upon expiration or that it is renewable on certain conditions specified in the agreement.  794 F. Supp. at 861-62.  The district court offered two reasons for this conclusion.  First, the parties clearly intended that the agreement would not be automatically renewable; any renewal would require express agreement by both parties.  *Id.* at 861.  Second, the parties stated that the agreement would be governed by New York law, not Indiana law, so there was no reason to draft the agreement to fit an Indiana statutory safe harbor.  *Id.*

The Seventh Circuit affirmed, relying on only the first ground:

> As we noted in our prior opinion, the agreement itself contains only a one-year term, although Wright-Moore had endeavored to obtain a two-year term.  Article 9(a) of the distributorship agreement required the negotiation and execution of an entirely new written agreement, showing that renewal was not automatic but that a new agreement would be necessary for renewal. Since this contract contained a non-renewable one-year term, under the above statutory provision good cause was not needed to enable defendant to terminate it.

980 F.2d at 437.

Similarly here, the 2003 MSO Agreement made crystal clear that renewal would not be automatic, but that a new agreement would be needed.  Either party, including Shell, could decline to renew "for any reason or no reason."  The terms

---

[4](...continued)
*Wright-Moore Corp. v. Ricoh Corp.*, 794 F. Supp. 844, 861 (N.D. Ind. 1991).

of the agreement fall within the reasoning of *Wright-Moore*. Shell therefore appears to have preserved its right not to renew RWJ's contract at the end of June 2006, even if the contract between RWJ and Shell is deemed subject to the Indiana Deceptive Franchise Practices Act.

As a result, Shell is entitled to force termination of the MSO Agreement, either in January 2006 or no later than June 2006, depending on whether RWJ has a viable challenge to the March 2005 Amendment Agreement. Even if RWJ has such a viable challenge, the difference between termination in January and June does not amount to irreparable harm. See *Micro Data Base Systems*, 165 F.3d at 1157 (business losses from termination of distributorship could be estimated and did not amount to irreparable harm). It should be possible to make reasonable estimates of lost profits resulting from termination that is premature by merely five months, thus providing an adequate remedy at law for any harm.

IV.   *Balance of Harms*

Even where the moving party has shown a reasonable likelihood of success on the merits of its claims and a threat of imminent irreparable harm, the court must still consider the interests of the party against whom relief is sought. The court must consider the irreparable harm the defendant would suffer if injunctive relief is granted erroneously. *Abbott Laboratories*, 971 F.2d at 11-12. The court must then weigh that risk of harm against the irreparable harm the plaintiff would suffer if injunctive relief is erroneously denied. As the Seventh Circuit has

explained, the court's goal should be to minimize the risk of error at the earliest stages of the case. *Id.* at 12, citing *American Hospital Supply*, 780 F.2d at 593; accord, *Roland Machinery*, 749 F.2d at 387.

Shell faces a significant risk of substantial irreparable harm if it were enjoined from terminating RWJ's contract and from selling the service stations to the higher bidder. If the court enjoined termination and sale of the service stations by Shell, and did so erroneously, Shell would lose the benefit of a bid that is higher than RWJ's bid by at least several million dollars. (The court has kept the exact value of the higher bid under seal.) And of course, the court could not force RWJ to buy the stations from Shell. Shell could be left with property it wishes to sell to the highest bidder and with obligations toward RWJ that would remain in place until this action could be resolved finally and definitively. At that time, there could be no guarantee that other bidders would be ready to match or exceed the current higher bid that Shell wishes to accept.[5]

---

[5]For this same reason, even if the court were to grant preliminary injunctive relief to RWJ, the court would probably require a bond or other security on the order of $10 million to account for the differences in the bids and other possible damages resulting to Shell from an erroneous injunction. The court would be obliged to require security in such a large amount because the recovery by a victim of a wrongful injunction in federal court is limited to the value of the security ordered by the court. See *Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 883, 887-88 (7th Cir. 2000) (finding that $1 million security was too low for preliminary injunction requiring changes in advertising claims for baby formula: "When setting the amount of security, district courts should err on the high side" because if security is too low the harm will be irreparable), *amended on denial of petition for rehearing*, 209 F.3d 1032 (7th Cir. 2000).

V.    *Public Interest*

In this dispute between Shell and RWJ over control and management of the cluster of Shell filling stations in Indianapolis, the public interest is essentially neutral.  The factor adds nothing to the relative strengths or weaknesses of the parties' claims and defenses on the merits.

VI.    *Conclusion*

For the foregoing reasons, plaintiff RWJ Companies' motion for a preliminary injunction preventing termination of its contracts with defendant Shell is hereby denied.

So ordered.

Date: December 28, 2005

David F. Hamilton
_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas A. Barnard
SOMMER BARNARD ATTORNEYS, PC
tbarnard@sommerbarnard.com

Jason R. Delk
ICE MILLER
jason.delk@icemiller.com

Michelle Marie Drake
GREENSFELDER HEMKER & GALE
mmd@greensfelder.com

David M. Harris
GREENSFELDER HEMKER & GALE PC
dmh@greensfelder.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

Debra McVicker Lynch
SOMMER BARNARD ATTORNEYS, PC
dlynch@sommerbarnard.com

Richard E. Shevitz
COHEN & MALAD LLP
rshevitz@cohenandmalad.com

Donald M. Snemis
ICE MILLER
snemis@icemiller.com

Philip A. Whistler
ICE MILLER
philip.whistler@icemiller.com